Brakebush Brothers., Inc. v. Certain Underwriters at Lloyd's of London - Novae 2007 Syndicate Subscribing to Pol'y No. 93PRX17F157, 2021 NCBC 70.

STATE OF NORTH CAROLINA

DAVIE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS 367

BRAKEBUSH BROTHERS, INC.,

Plaintiff,

v.

CERTAIN UNDERWRITERS AT
LLOYD'S OF LONDON - NOVAE
2007 SYNDICATE SUBSCRIBING
TO POLICY WITH NUMBER
93PRX17F157; HALLMARK
SPECIALTY INSURANCE CO.;
EVANSTON INSURANCE CO.;
MAXUM INDEMNITY CO.;
HUDSON SPECIALTY INSURANCE
CO.; LIBERTY SURPLUS
INSURANCE CORPORATION;
IRONSHORE SPECIALTY
INSURANCE CO.; and CERTAIN
UNDERWRITERS AT LLOYD'S OF
LONDON -BRIT SYNDICATE
2987 SUBSCRIBING TO POLICY
WITH NUMBER PD-10972-00,

Defendants.

**ORDER AND OPINION ON
DEFENDANTS' JOINT MOTION TO
DISMISS OR STRIKE AND
PLAINTIFF'S MOTION TO STRIKE**

**THIS MATTER** comes before the Court on Defendants' Joint Motion to Dismiss or Strike pursuant to Rules 12(b)(1), 12(b)(6), and 12(f) of the North Carolina Rules of Civil Procedure (ECF No. 42) and Plaintiff's Motion to Strike Portions of Defendants' Reply Brief or, in the Alternative, Motion for Leave to File Sur-Reply pursuant to Rule 12(f) (ECF No. 60).

**THE COURT**, having considered the motions, the briefs of the parties, the arguments of counsel, the transcript of a hearing held in this matter on the pending motions, and all applicable matters of record, **CONCLUDES**, for the reasons set forth

below, that the Defendants' Motion should be **GRANTED** in part and **DENIED** in part, and that Plaintiff's Motion should be **DENIED**.

*Kilpatrick Townsend & Stockton LLP, by Susan Boyles, and Dorsey & Whitney LLP, by Eric Weisenburger and Vernle C. Durocher, for Plaintiff Brakebush Brothers Inc.*

*Nelson Mullins Riley & Scarborough LLP, by G. Gray Wilson and Stuart Russell, and Tressler, LLP, by Timothy Jabbour, Anthony Tessitore, and Kiera Fitzpatrick, for Defendants Certain Underwriters at Lloyd's of London – Brit Syndicate 2987, Evanston Insurance Company, Maxum Indemnity Company, Hudson Specialty Insurance Company, Liberty Surplus Insurance Corporation, and Ironshore Specialty Insurance Company.*

*Butler Weihmuller Katz Craig LLP, by Clark Schirle, N. Khrystyne Smith, and L. Andrew Watson, for Defendant Certain Underwriters at Lloyd's of London Novae 2007 Syndicate.*

*Akerman, LLP, by Bryan G. Scott, for Defendant Hallmark Specialty Insurance Company.*

Davis, Judge.

## INTRODUCTION

1.      A fire at a chicken processing plant has caused a dispute over insurance proceeds that has left millions of dollars hanging in the balance.  After the fire, the purchaser of the plant received an assignment from the original owner of its right to collect insurance proceeds under various insurance policies taken out by the original owner.  Consent to the assignment was obtained from the insurer that had issued an insurance policy providing *primary* coverage for the plant.  No consent was obtained, however, from any of the insurers that had issued *excess* insurance policies covering the plant.  The question of whether the purchaser is entitled to sue these excess insurers in an effort to make them "pay up" despite the lack of prior consent to the

assignment is the primary issue before the Court. In analyzing this question, the Court must wade through a complex web of insurance policy provisions and legal issues.

## FACTUAL AND PROCEDURAL BACKGROUND

2. The Court does not make findings of fact on a motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure and instead recites those facts contained in the complaint (and in documents attached, referred to, or incorporated by reference in the complaint) that are relevant to the Court's determination of the motion. *See, e.g., Concrete Serv. Corp. v. Inv'rs Grp., Inc.*, 79 N.C. App. 678, 681 (1986); *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2017 NCBC LEXIS 60, at *11 (N.C. Super. Ct. July 12, 2017).

3. On December 14, 2017, a fire caused substantial damage to a chicken processing facility located in Mocksville, North Carolina. (Complaint, ECF No. 3, at ¶ 2.) At the time of the fire, the facility was owned by House of Raeford Farms, Inc. ("Raeford"), but Plaintiff Brakebush Brothers, Inc. ("Brakebush") "was in the process of purchasing the [facility] from Raeford when the fire occurred." (*Id.*)

4. As of the date of the fire, Raeford had obtained two layers of commercial property insurance coverage for the facility: (1) a *primary* insurance policy issued by "Certain Underwriters at Lloyd's of London and various syndicates subscribing to that policy" with a limit of $20,000,000 ("the Primary Policy"); and (2) eight *excess*

insurance policies that provided, in total, limits of $30,000,000 in "excess of the $20 million primary policy limits." (*Id.* at ¶¶ 30–31.)[1]

5. The insurers who issued the Excess Policies are the named Defendants in this action: Certain Underwriters at Lloyd's of London – Novae 2007 Syndicate Subscribing to Policy With Number 93PRX17F157 ("Novae"), Hallmark Specialty Insurance Co. ("Hallmark"), Evanston Insurance Co. ("Evanston"), Maxum Indemnity Co. ("Maxum"), Hudson Specialty Insurance Co. ("Hudson"), Liberty Surplus Insurance Corporation ("Liberty"), Ironshore Specialty Insurance Co. ("Ironshore"), and Certain Underwriters at Lloyd's of London – Brit Syndicate 2987 Subscribing to Policy With Number PD-10972-00 ("Brit"). (*Id.* at ¶ 31.)[2]

6. Brakebush and Raeford executed an Asset Purchase Agreement ("A.P.A") on July 3, 2018. (*Id.* at ¶ 28.) As a part of the transaction, Brakebush "secur[ed] the assignment of Raeford's right to all insurance benefits, including all rights and proceeds under its property insurance policies relating to the loss" resulting from the fire. (*Id.* at ¶ 2.) Approximately five days before the A.P.A. was executed, the insurers who had issued the Primary Policy gave written consent to this assignment. (*Id.* at ¶ 29.)[3]

---

[1] Throughout this opinion, these eight policies are at times referred to collectively as the "Excess Policies."

[2] Defendants are referred to collectively throughout this opinion as the "Excess Insurers."

[3] As discussed later in this opinion, however, it appears that the Primary Policy did not, in fact, actually require the consent of the insurers to the assignment of the proceeds under that policy. (Primary Policy, ECF No. 84.1.)

7.   Neither Brakebush nor Raeford, however, obtained consent from any of the Excess Insurers prior to the assignment to Brakebush of Raeford's right to collect insurance proceeds under these policies.  (*Id.*)

8.   On February 3, 2020, Brakebush submitted a report to Crawford and Company, a claims management company hired by one or more of the insurers, claiming that the overall fire damage loss to the insured property totaled $41,274,429. (*Id.* at ¶ 32, 34.)  As Raeford had already received $ 4,241,277.18 under the Primary Policy prior to the sale, Brakebush asserted that it was entitled to the remaining $15,758,722.82 of the policy limits under the Primary Policy "for amounts it incurred after the sale was completed."  (*Id.* at ¶ 35.)  On or about April 29, 2020, Brakebush received a final payment exhausting the $20 million in coverage under the Primary Policy.  (*Id.* at ¶ 35.)  Brakebush then contacted counsel for the Excess Insurers and demanded payment of insurance proceeds in the amount of $25,515,706.31, a figure that consisted of the total alleged loss minus the $15,758,722.82 that had already been paid to Brakebush under the Primary Policy.  (*Id.* at ¶ 34–36.)

9.   The Excess Insurers expressed an unwillingness to pay the full amount demanded by Brakebush, instead offering only a combined $4,221,465.83, a substantially smaller amount than Brakebush's demand.  (*Id.* at ¶ 37.)  The Excess Insurers initially took the position that they would make this payment only if Brakebush agreed that said payment constituted "full and final payment for all covered damages."  (*Id.*)  In addition, the Excess Insurers required that Brakebush execute proof of loss forms with each insurer.  (Nuss Aff. Ex. 1, ECF No. 52.)  The

proof of loss forms were signed by Brakebush's representative above the line entitled "Insured's Assignee." (*Id.*)

10.     Since May 1, 2020, Brakebush has repeatedly requested that the Excess Insurers explain why they refused to pay the remaining $21 million that Brakebush had demanded. (ECF No. 3, at ¶ 39.) At some point, the Excess Insurers provided Brakebush with "Claim Work Papers," which Brakebush alleges "showed that the Excess Insurers owed at least $5,782,089.14 to Brakebush." (*Id.* at ¶ 39–41.)

11.     Counsel for the Excess Insurers sent Brakebush's counsel a letter on June 18, 2020 stating, among other things, that the Excess Insurers "reserve all rights to deny or limit coverage pursuant to the relevant policy language regarding an assignment of rights under the subject policy." (June 18, 2020 Letter, ECF No. 44.6.)

12.     On July 1, 2020, Brakebush notified the Excess Insurers of additional losses and expenses from the fire totaling $2,206,532.84, increasing its total demand to $27,722,239.15. (ECF No. 3, at ¶ 44–45.)

13.     The Excess Insurers ultimately agreed to pay $4,221,465.83 to Brakebush without requiring Brakebush to agree that this payment constituted a "full and final payment," thereby allowing Brakebush to continue pursuing the total amount it sought under the Excess Policies for the fire damage. (*Id.* at ¶ 40.)

14.     On October 8, 2020, Brakebush filed a complaint initiating this action in Superior Court, Davie County, against the Excess Insurers. In its Complaint, Brakebush asserted a claim for a declaratory judgment regarding the obligations of

the Excess Insurers along with claims for breach of contract, bad faith, and unfair and deceptive trade practices (UDTP). (*Id.* at ¶¶ 47–79.) This case was designated a mandatory complex business case on December 2, 2020 and assigned to the Honorable Gregory P. McGuire. (ECF Nos. 1, 2.)

15. On January 6, 2021, Defendants filed a Joint Motion to Dismiss or Strike in which they sought the dismissal of the claims asserted by Brakebush on various grounds and that one of the claims be stricken. (ECF No. 42.) After Defendants filed their reply brief in support of the Joint Motion to Dismiss or Strike, Brakebush moved to strike portions of the Defendants' reply brief on March 8, 2021. (ECF No. 60.) A hearing on Defendants' Joint Motion to Dismiss or Strike and Plaintiff's Motion to Strike was held on April 15, 2021 but a decision on the motions was not rendered.

16. On July 1, 2021, this matter was reassigned to the undersigned. (ECF No. 79.)

17. At the Court's direction, the parties submitted supplemental briefs on August 26, 2021 as to certain specified issues. The parties were offered the opportunity for a new hearing before the undersigned, but the parties declined the offer based on the undersigned's ability to review a complete transcript of the April 15, 2021 hearing. The motions are now ripe for resolution.

**LEGAL STANDARD**

18. The arguments asserted by the parties in the various motions pending before the Court are based on several distinct provisions of the North Carolina Rules

of Civil Procedure. The Excess Insurers have moved to dismiss each claim contained in the Complaint under Rule 12(b)(1) for lack of subject matter jurisdiction on the theory that Brakebush does not possess standing to bring any of the claims it has asserted against them. The Excess Insurers also seek dismissal of all claims under Rule 12(b)(6) for failure to state a valid claim for relief. Finally, the Excess Insurers have moved to strike the declaratory judgment claim asserted by Brakebush pursuant to Rule 12(f) on the ground that it is redundant. Brakebush, in turn, has moved to strike portions of the Excess Insurers' reply brief in support of their Joint Motion to Dismiss or Strike on the ground that portions of the brief improperly contain new arguments not set out in the Excess Insurers' original brief. Each of these respective provisions of the Rules of Civil Procedure has its own standard of review.

19. "A plaintiff's standing to assert its claims may be challenged under either Rule 12(b)(1) or Rule 12(b)(6) of the North Carolina Rules of Civil Procedure." *Raja v. Patel*, 2017 NCBC LEXIS 25, at *11 (N.C. Super. Ct. Mar. 23, 2017). A Rule 12(b)(1) motion challenges a court's "jurisdiction over the subject matter" of the plaintiff's claims. N.C. R. Civ. P. 12(b)(1). "Subject matter jurisdiction is the indispensable foundation upon which valid judicial decisions rest," *In re T.R.P.*, 360 N.C. 588, 590 (2006), and "has been defined as 'the power to hear and to determine a legal controversy; to inquire into the facts, apply the law, and to render and enforce a judgment,'" *High v. Pearce*, 220 N.C. 266, 271 (1941). "[T]he proceedings of a court

without jurisdiction of the subject matter are a nullity." *Burgess v. Gibbs*, 262 N.C. 462, 465 (1964) (citation omitted).

20. "As the party invoking jurisdiction, plaintiff[] ha[s] the burden of establishing standing." *Queen's Gap Cmty. Ass'n v. McNamee*, 2011 NCBC LEXIS 37, at **3 (N.C. Super. Ct. Sept. 23, 2011). In determining the existence of subject matter jurisdiction, the Court may consider matters outside the pleadings. *Emory v. Jackson Chapel First Missionary Baptist Church*, 165 N.C. App. 489, 491 (2004). However, "if the trial court confines its evaluation [of standing] to the pleadings, the court must accept as true the [claimant]'s allegations and construe them in the light most favorable to the [claimant]." *Munger v. State*, 202 N.C. App. 404, 410 (2010) (quoting *DOT v. Blue*, 147 N.C. App. 596, 603 (2001)).

21. "It is well-established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.' " *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (quoting *Wood v. Guilford Cty.*, 355 N.C. 161, 166 (2002)). The Court may also "reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Laster v. Francis*, 199 N.C. App. 572, 577 (2009).

22. Rule 12(f) permits a judge, upon motion or *sua sponte*, to "strik[e] from any pleading any insufficient defense or any redundant, irrelevant, immaterial,

impertinent, or scandalous matter." N.C. R. Civ. P. 12(f). The purpose of this rule is to "avoid expenditure of time and resources before trial by removing spurious issues, whether introduced by original or amended complaint." *Estrada v. Jaques*, 70 N.C. App. 627, 642 (1984). A motion to strike is addressed to the sound discretion of the trial court. *Broughton v. McClatchy Newspapers, Inc.*, 161 N.C. App. 20, 25 (2003).

## ANALYSIS

### A. Defendants' Rule 12(b)(1) Motion

23. The most significant bone of contention between the parties concerns the Excess Insurers' challenge to Brakebush's standing to seek coverage under the Excess Policies. The Excess Insurers argue that each policy contains a provision requiring the consent of the insurer before a policyholder (such as Raeford) may validly assign its right to collect proceeds under the policy to a third party (such as Brakebush) and that no such consent was ever obtained in the present case. The Excess Insurers further contend that an assignee of insurance proceeds lacks standing to sue for bad faith or unfair and deceptive trade practices because the assignee is a "stranger" to the insurance contract.

24. In response, Brakebush asserts that (1) North Carolina law does not allow for the enforcement of anti-assignment clauses in an insurance policy with regard to the post-loss assignment of proceeds; (2) even if such anti-assignment clauses are enforceable as a general proposition, none of the Excess Policies actually contain language that serve to prohibit the post-loss assignment of insurance proceeds without the consent of the insurer; and (3) even if otherwise enforceable

anti-assignment language was contained in the policies, the Excess Insurers waived their right to rely on such language by paying Brakebush $4,221,465.83 and by providing proof of loss forms that referred to Brakebush as the "Insured's Assignee."

## 1. Standing for Declaratory Judgment and Breach of Contract Claims

### a. Threshold Arguments

25.     "[S]tanding to seek a declaration as to the extent of coverage under an insurance policy requires that the party seeking relief have an enforceable contractual right under the insurance agreement." *DeMent v. Nationwide Mut. Ins. Co.,* 142 N.C. App. 598, 601 (2001).  As a general proposition, "[t]he right to receive money due or to become due under an existing contract may be assigned.  An assignee of a contractual right is a real party in interest and may maintain the action." *Gr&S Atl. Beach, LLC v. Hull*, 2013 NCBC LEXIS 35, at *9 (N.C. Super. Ct. July 26, 2013) (citations omitted).  Thus, Brakebush must establish that it was properly assigned the right by Raeford to collect the proceeds under each of the Excess Policies in order to establish standing for its declaratory judgment and breach of contract claims.

26.     The parties have each raised two threshold issues relating to standing. The Court deems it appropriate to address these issues at the outset.

### i. Brakebush's Threshold Arguments

27.     First, Brakebush argues that it is irrelevant whether the Excess Policies contain provisions purporting to prohibit the assignment of post-loss insurance proceeds because such clauses are unenforceable under North Carolina law as a matter of public policy.  Brakebush argues that our Court of Appeals' decision in *First-*

*Citizens Bank and Trust Co. v. Universal Underwriters Ins. Co.*, 113 N.C. App. 792 (1994), establishes that the validity of a post-loss assignment of proceeds can never be restricted by the language of an insurance policy. The Excess Insurers, in turn, cite *Terrell v. Lawyers Mut. Liab. Ins. Co.*, 131 N.C. App. 655 (1998), a later decision from the Court of Appeals, for the proposition that North Carolina courts do, in fact, enforce such provisions.

28. In *First-Citizens Bank*, an automotive dealership and a bank entered into a contract in which the dealership assigned " 'all rights, title, and interest (both legal and equitable)' in [the dealership's] insurance policy" in order for the bank to receive the proceeds of a policy insuring a car belonging to the bank that was stolen while on the dealership's premises. *First-Citizens Bank*, 113 N.C. App. at 792–95. The policy contained the following statement: "ASSIGNMENT – No assignment of interest will affect this Policy unless WE [defendant] change the policy." *Id.* at 796. The policy also contained the following clause:

> Changes- The only way this policy can be changed is OUR issuing an endorsement(s) or substituting the declarations. They must be signed by one of OUR representatives when required by law. Nothing else will change this policy, waive any of its terms, or stop U.S. [sic] from asserting any of OUR rights, not even notice to or knowledge learned by one of OUR representatives. If WE change any of the terms of this policy, which broadens or extends the coverage, this policy will automatically be broadened or extended as if it were actually endorsed, if the change (a) was approved by YOUR state insurance regulatory authority, during the policy period or 45 days before the policy became effective; and (b) is available to YOU without additional premiums.

*Id.* at 796.

29. The Court of Appeals rejected the defendant's argument that the attempted assignment was invalid based on the above-quoted language from the policy. The Court of Appeals explained its reasoning as follows:

> [W]e conclude that the assignment of the mere right to payment after loss in no way broadened the scope of the coverage of insurable risks provided by defendant's policy. We particularly note that this policy did not expressly prohibit assignments: rather, our disposition here turns on the express words chosen by the defendant-insurer in this policy. We note further that most of the cases from other jurisdictions regard such express prohibitions as generally ineffective when applied to assignments which occur after the loss has been incurred[.][4]

*Id.* (internal citations omitted).

30. In *Terrell*, an attorney subject to a potential malpractice claim "assigned any rights he had against [the defendant insurer] under the policy or under tort law" to the malpractice claimant. *Terrell*, 131 N.C. App. at 656–57. The malpractice claimant sued the attorney's insurer, "alleging that, as [the attorney's] assignee, she was entitled to recover against [the insurer] for [its] alleged breach of contract with [the attorney] or any tort rights that [the attorney] had against [the insurer]." *Id.* at 657.

31. The Court of Appeals concluded that the plaintiff's attempt to hold the insurer liable on a contractual theory was defective because of anti-assignment

---

[4] "In most jurisdictions, courts have held that an anti-assignment clause ordinarily will not apply to a post-loss assignment under a first-party insurance policy. . . . Although widely held and applied, this rule is not universal." 3 NEW APPLEMAN ON INSURANCE LAW LIBRARY EDITION § 16.05 (2021).

language in the policy. *Id.* at 660. The Court of Appeals explained the basis for its decision as follows:

> Viewing the facts and permissible inferences under Rule 12(c) in the light most favorable to plaintiff and taking plaintiff's factual allegations as true, plaintiff's claims against defendant arising out of contract are barred because any rights of [the attorney] under the policy cannot be assigned. The insurance policy in the instant action states, "The interest of any Insured in this policy is not assignable." Under the terms of the policy, [the attorney's] interest in the policy and any coverage or benefits that otherwise might exist are not assignable.

*Id.*

32. Based on a careful review of applicable case law, the Court concludes that insurance policy provisions prohibiting or restricting post-loss assignments are enforceable under North Carolina law. Brakebush's reliance on *First-Citizens Bank* is misplaced as the decision in that case was based on an interpretation of the specific language used in the insurance policy at issue. The Court does not interpret *First-Citizens Bank* as standing for the broad proposition that such clauses are *per se* unenforceable as applied to a post-loss assignment of proceeds. Any statements contained in *First-Citizens Bank* about the public policy implications of anti-assignment clauses are merely *dicta*. Any such anti-assignment clauses are therefore to be construed based on the actual language contained in the insurance policy. *See Capital City Ins. Co. v. Utica Mut. Ins. Co.*, 2009 U.S. Dist. LEXIS 154221, at *6–7 (E.D.N.C. June 15, 2009) ("Here, as in *Terrell*, the Policy spells out in certain terms the limitations on assignment of an insured's interests under the Policy: the rights of

the insured are not assignable without [the insurer's] written consent."). Accordingly, Brakebush's first threshold argument fails.

33. The second threshold argument advanced by Brakebush is that the Excess Insurers waived any anti-assignment provisions in the Excess Policies when they paid $4,221,465.83 to Brakebush prior to the initiation of this litigation and provided proof of loss forms that contained a line for Brakebush to sign as "Insured's Assignee." In response, the Excess Insurers deny that any such waiver occurred and contend that the payments were made under a clear reservation of rights that specifically preserved their right to challenge the validity of the assignment under the Excess Policies.

34. "A waiver is a voluntary and intentional relinquishment of a known right or benefit." *Adder v. Holman & Moody, Inc.*, 288 N.C. 484, 492 (1975). Our appellate courts have held that a party's conduct may under certain circumstances give rise to a legal waiver. *See, e.g.*, *Son-Shine Grading, Inc. v. ADC Constr. Co.*, 68 N.C. App. 417, 422 (1984) (citations omitted) ("The provisions of a contract may be modified or waived by . . . conduct which naturally and justly leads the other party to believe the provisions of the contract have been modified or waived, even though the instrument involved provides that only written modifications shall be binding."), *disc. review denied*, 312 N.C. 85 (1984).

35. In this case, the Excess Insurers issued their payment to Brakebush pursuant to an express reservation of rights. In a letter to Brakebush's counsel dated June 18, 2020, counsel for the Excess Insurers stated that "[t]he Insurers have and

continue to reserve all rights under the relevant policy language regarding an assignment of rights under the subject Policies." (ECF No. 44.6.)

36. Courts in other jurisdictions have held that when an insurer issues a payment subject to a reservation of rights, the insurer has not waived its right to subsequently deny coverage. *See, e.g.*, *Polizzi Meats v. Aetna Life & Cas. Co*, 931 F. Supp. 328, 337 (D.N.J. 1996) ("There has been no waiver in this case. [The insurer] expressly reserved its rights in the . . . letter from [the insurer] to [plaintiff's] adjuster, which immediately followed the $100,000 payment."); *see also 1426 Wisconsin, L.L.C. v. Travelers Indem. Co. of Am.*, 110 F. Supp. 3d 259, 269 (D.D.C. 2015) ("[The insurer] has not conceded liability. Rather, it properly reserved its rights under the policy.").[5] Although the Court has been unable to identify a North Carolina case involving the issue of whether a reservation of rights letter was effective to preclude waiver of an anti-assignment clause in an insurance policy, North Carolina courts have recognized the ability of an insurer to take action favorable to the insured subject to a reservation of rights. *See Fortune Ins. Co. v. Owens*, 351 N.C. 424, 431 (2000) ("Generally an insurer is not barred from later denying coverage when it defends its insured with a reservation of its rights to deny coverage.").

37. Moreover, the Court is not persuaded by Brakebush's contention that the Excess Insurers' utilization of a standard proof of loss form constituted a waiver of their right to contest the validity of the assignment at issue. Even though the proof

---

[5] Although cases from other states are, of course, not binding on issues of North Carolina law, they may be considered to the extent they are deemed instructive. *See Carolina Power & Light Co. v. Employment Sec. Comm'n of N.C.*, 363 N.C. 562, 569 (2009).

of loss forms may have identified Brakebush as "Assignee," the mere use of this form—without more—is simply insufficient to show an intentional waiver by the Excess Insurers of their right to challenge Brakebush's status as an assignee. Accordingly, the Court concludes that Brakebush's second threshold argument based on waiver is without merit.

### ii. The Excess Insurers' Threshold Arguments

38.     The first threshold argument made by the Excess Insurers can be summarized as follows: (a) Brakebush's Complaint alleges that "in accordance with the policies' terms, each of the primary carriers consented to this assignment in writing" (ECF No. 3, at ¶ 29); (b) as a result of this allegation, Plaintiff has conceded that consent of the Primary Insurers was required under the Primary Policy; and (c) because the Excess Policies "follow form"[6] to the Primary Policy, each of the Excess Policies necessarily likewise require written consent by the Excess Insurers with regard to any assignments. (*Id.* at ¶ 31.)

39.     The most basic flaw in this argument is that based on the Court's review of the Primary Policy, it does not appear to actually contain any anti-assignment language (or any policy language that would otherwise require the consent of the Primary Insurers to any assignment of rights under the policy). To the extent the Complaint states that the Primary Policy *does*, in fact, require the consent of the insurer to any assignments, that assertion is erroneous, and the Court is clearly not

---

[6] "Following-form excess policies state that except for the policy limits, all of the provisions, conditions, and exclusions of the underlying policy are incorporated into and adopted by the excess policy." 1 LNPG: NEW APPLEMAN NC INSURANCE LITIGATION § 10.09(2) (LexisNexis 2021).

bound by such a statement that is contradicted by the language of the actual insurance policy at issue. *See Laster*, 199 N.C. App. at 577 (holding that courts may "reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint.") Therefore, the Excess Insurers' "follow form" argument lacks merit.

40. The second threshold argument advanced by the Excess Insurers is that the A.P.A. contained language restricting any assignment of insurance proceeds. The Court disagrees. In making this argument, the Excess Insurers rely upon the following language in the A.P.A.: "Anything in this Agreement to the contrary notwithstanding, the Seller shall not be obligated to transfer to the Buyer any Restricted Interests without the Buyer or the Seller first having obtained all Consents necessary for such transfers." (ECF No. 44.2, at 4.) However, the A.P.A. contains no independent restriction on the assignability of the right to collect proceeds under the Excess Policies, and the Excess Insurers' argument begs the question as to whether the Excess Policies themselves actually contained language requiring such consent before an assignment of post-loss proceeds could occur.

**b. Anti-Assignment Language in the Excess Policies**

41. Having disposed of the parties' threshold arguments, the Court now turns to the pertinent language in each of the Excess Policies. Initially, the Court notes that although the Excess Insurers take the position that each of the Excess Policies contains language requiring insurer consent before any valid assignment of

proceeds under the policy can occur, the Court—as discussed in detail below—concludes that some of the policies contain such language while others do not.

42.     "It is well established that contracts for insurance are to be interpreted under the same rules of law as are applicable to other written contracts." *Estrada v. Timber Structures, Inc.*, 237 N.C. App. 202, 206 (2014) (quotation omitted). "When interpreting the relevant provisions of the insurance policy at issue, North Carolina courts have long held that any ambiguity or uncertainty as to the words used in the policy should be construed against the insurance company and in favor of the policyholder or beneficiary." *Accardi v. Hartford Underwriters Ins. Co.*, 373 N.C. 292, 295 (2020) (citation omitted).

43.     The Court must, therefore, examine the specific policy provisions relied upon by the Excess Insurers in support of their argument that each policy contains language that required insurer consent before the assignment at issue between Raeford and Brakebush could become legally effective.

### i.     Brit Policy

44.     The Brit Policy states, in pertinent part, as follows:

> **Assignment**. This Certificate shall not be assigned either in whole or in part without the written consent of the Correspondent[7] endorsed hereon.

(ECF No. 44.8, at p. 2.)

45.     This provision requires that *any* assignment of rights under the Brit Policy is subject to a consent requirement. An assignment of the right to obtain post-

---

[7] Brit Global Specialty USA is identified as the "Correspondent" in the policy. (ECF No. 44.8, at p. 1.)

loss proceeds under the policy is a type of assignment—albeit a limited one. Therefore, Brakebush lacks standing to seek proceeds under the Brit Policy based on the absence of such required consent.

### ii. Liberty Policy

46. The Liberty Policy contains the following provision:

**Transfer of Your Rights and Duties Under This Policy**

**Your** rights and duties under this policy may not be transferred without our written consent.

(ECF No. 44.9, at p. 9.)

47. The broad language used in this section of the policy unambiguously requires the insurer's written consent to effect any transfer of rights, including an assignment of the right to seek post-loss proceeds. Accordingly, Brakebush's failure to obtain Liberty's written consent deprives Brakebush of standing to seek proceeds under this policy.

### iii. Evanston Policy

48. The Evanston Policy contains the following provision:

**Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

(ECF No. 44.10, at p. 28.)

49. Once again, the broad language of this provision required insurer consent before an effective transfer of Raeford's right to seek post-loss proceeds under

the policy could be made to Brakebush. Therefore, Brakebush lacks standing with regard to this policy as well.

### iv.    Maxum Policy

50.    The Excess Insurers attempt to rely on three separate provisions of the Maxum Policy to challenge Brakebush's standing. The first reads as follows:

> **Changes**
>
> . . . You are only authorized to make changes in the terms of this policy with the Companies [sic] consent. The policies [sic] terms can be amended or waived only by endorsement issued by Us and made part of this policy.

(ECF No. 44.11, at p. 14.)

51.    The Maxum Policy does not contain a definition of the word "terms." "In determining the ordinary meaning of a word [in an insurance policy], it is appropriate to look to dictionary definitions. Our Supreme Court has held that 'use of the plain, ordinary meaning of a term is the preferred construction.' " *Herring v. Liner*, 163 N.C. App. 534, 538 (2004) (quoting *C.D. Spangler Constr. Co. v. Industrial Crankshaft & Eng. Co.*, 326 N.C. 133, 151 (1990)). The word "terms" refers to "provisions that determine the nature and scope of an agreement." *Terms*, Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/terms.

52.    The Court is of the view that an ambiguity exists as to whether this provision requires the consent of the insurer to an assignment of the right to recover post-loss proceeds. As noted above, it is well-settled that ambiguities in an insurance policy must be construed against the insurer. *See Accardi*, 373 N.C. at 295.

Accordingly, the Court concludes that this provision did not require Brakebush to obtain Maxum's consent in the present case.

53. The second provision of the Maxum Policy relied upon by the Excess Insurers provides:

**No Benefit to Bailee**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

(ECF No. 44.11, at p. 15.)

54. The "No Benefit to Bailee" clause is not an anti-assignment clause. "The generally accepted definition of a bailment is that it is a delivery of goods in trust upon a contract, express or implied, that the trust shall be duly executed, and the goods restored by the bailee as soon as the purposes of the bailment shall be answered." *Modern Electric Co. v. Dennis*, 255 N.C. 64, 72 (1961) (citation omitted). Therefore, this clause is directed to those persons who may have temporary custody— but not title—to insured property. In this case, Brakebush is not a bailee and instead is the legal owner of the property at issue. Therefore, the "No Benefit to Bailee" clause did not serve to restrict Raeford's ability to assign its right to post-loss proceeds under the Maxum Policy to Brakebush.

55. The final provision in the Maxum Policy relied upon by the Excess Insurers states as follows:

**Contract of Sale**

1. The Loss Payee shown in the Schedule or in the Declarations is a person or organization you have entered a contract with for the sale of Covered Property.

(ECF No. 44.11, at p. 47.)

56.     The Excess Insurers have offered no persuasive argument that this clause serves as an anti-assignment clause. Accordingly, the Court concludes that Brakebush possesses standing to seek proceeds under the Maxum Policy.

### v.     Ironshore Policy

57.     The Ironshore Policy does not contain any anti-assignment language at all. However, it does contain the following provision:

> **Perils Insured Against**
>
> This Policy insures against "All Risks" of direct physical loss or damage to the Insured's property, *subject to the same exclusions, warranties, terms, definitions and conditions as are contained in or as may be added or endorsed to the primary and underlying policy(ies) covering the Insured's identical property*. Coverage as provided herein shall also be subject to the premium, policy limits of liability, and all other exclusions, warranties, terms, definitions and conditions of this policy, which shall supersede any exclusions, warranties, terms, definitions and conditions of the primary and underlying policy(ies) in conflict with this policy. The coverage provided by this policy shall in no event provide broader coverage than the coverage provided by such primary and underlying policies.

(ECF No. 44.12, at p. 5) (emphasis added).

58.     The Excess Insurers contend that this "follow form" clause means that the same restrictions on assignments that are contained in the Primary Policy apply equally to the Ironshore Policy as well. However, implicit in this argument is the assertion that the Primary Policy actually contains an anti-assignment clause. As

discussed earlier, no such language appears therein. Therefore, the Excess Insurers' "follow form" argument as applied to the Ironshore Policy is meritless.

## vi. Novae Policy

59. The Novae Policy contains a provision that provides:

**Assignment**

Assignment or transfer of this Policy will not be valid except with the prior written consent of the Company.

(ECF No. 44.14, at p. 32.)

60. This clause, on its face, requires prior written consent before the policy itself may be assigned or transferred. However, the assignment between Raeford and Brakebush was not of the *entire* policy. Rather, it was an assignment as to one particular right under the policy—that is, the right to recover post-loss proceeds. Therefore, the Court does not interpret this provision as requiring insurer consent before Brakebush could be assigned the right to collect proceeds, and Brakebush possesses standing to seek such benefits under the Novae Policy.

## vii. Hallmark Policy

61. The Hallmark Policy states in pertinent part:

**Assignment**

Assignment or transfer of this Policy will not be valid except with the prior written consent of the Company.

(ECF No. 44.15, at p. 30.)

62.     This language is identical to the above-quoted provision of the Novae Policy. As such, for the same reasons discussed above, Brakebush possesses standing to seek post-loss proceeds under the Hallmark Policy.

### viii.     Hudson Policy

63.     Finally, the Hudson Policy provides, in pertinent part, as follows:

> When Hudson Specialty Insurance Company is participating on a layer with one or more other carriers, and more favorable terms or conditions are granted to one or more of such other carrier(s), it is a condition of this Policy that such more favorable terms and conditions be extended to Hudson Specialty Insurance Company. *More favorable terms and conditions shall mean additional exclusionary verbiage*, larger deductibles, reduced limits, or increased premium.[8]

(ECF No. 44.13, at p. 22) (emphasis added).

64.     Based on the above-quoted language from the Hudson Policy, the Excess Insurers argue that because at least some of the Excess Policies contain anti-assignment provisions that are written broadly enough to have required insurer

---

[8] Brakebush suggests that New York law—rather than North Carolina law—may govern the Hudson Policy because of a clause contained in the policy which states, "This Policy shall be interpreted solely according to the law of the State of New York without regard to the choice of law provisions of New York." (ECF No. 44.13, at p. 16). The Court concludes, however, that the Hudson Policy is instead governed by North Carolina law. North Carolina's General Statutes provide that "[a]ll contracts of insurance on property, lives, or interests in this State shall be deemed to be made therein, and all contracts of insurance the applications for which are taken within the State shall be deemed to have been made within this State and are subject to the laws thereof." N.C.G.S. § 58-3-1 (2019); *see Cordell v. Brotherhood of Locomotive Fireman & Enginemen*, 208 N.C. 632, 640 (1935) (citation omitted) (holding that a "provision in a contract of insurance that '[t]his contract shall be governed by, subject to and construed only according to the laws of the State of New York, the home office of said association,' is void in so far as the courts of this State are concerned"). Therefore, the Hudson Policy is deemed to be made in North Carolina, and North Carolina law applies to this case. *See Davis v. Davis*, 269 N.C. 120, 124 (1967) ("[T]he validity and construction of a contract are to be determined by the law of the place where it is made.").

consent in this case, those same provisions must necessarily be deemed applicable to the Hudson Policy as well. However, the Court is not persuaded by this argument. Although one can argue that a provision that limits the right of assignment favors the insurer because it takes away a right the insured would otherwise possess, one can also argue that such a provision does not qualify as "exclusionary verbiage" since it does not actually restrict or diminish coverage under the policy. An "exclusionary clause" generally refers to "a provision in an insurance policy listing the exceptions to coverage and circumstances that prohibit recovery under the policy." *Exclusionary clause*, BLACK'S LAW DICTIONARY (10th ed. 2004). An anti-assignment clause does not fit within this definition. Indeed, as discussed above, our Court of Appeals in *First-Citizens Bank* expressly stated that "the assignment of the mere right to payment after loss in no way broadened the scope of the coverage of insurable risks provided by defendant's policy." *First-Citizens Bank*, 113 N.C. App. at 796.

65. The Court therefore concludes that the phrase "exclusionary verbiage" in this context is, at best, ambiguous and must therefore be construed against the Excess Insurers. Accordingly, the Court concludes that Brakebush has standing to pursue its claims under the Hudson Policy.

66. In summary, Brakebush has established standing to assert its claims for breach of contract and declaratory judgment under the Maxum, Ironshore, Novae, Hallmark, and Hudson Policies, but not under the Brit, Evanston, or Liberty Policies. Accordingly, the Excess Insurers' Motion to Dismiss the declaratory judgment and breach of contract claims pursuant to 12(b)(1) is GRANTED with respect to the Brit,

Liberty, and Evanston Policies and DENIED as to the Maxum, Ironshore, Novae, Hallmark, and Hudson Policies.

## 2. Standing to Assert Bad Faith and UDTP Claims

67. The Excess Insurers also argue that under North Carolina law Brakebush lacks standing to sue the Excess Insurers for bad faith or UDTP because Brakebush—unlike Raeford—was not a party to the policies issued by these insurers. Brakebush disagrees, contending that North Carolina law does not prohibit an assignee from asserting bad faith or UDTP claims where—as here—such claims are based on the assignee's own interactions with an insurer.

68. As an initial matter, the Court has already ruled that Brakebush lacks standing to assert claims for breach of contract and declaratory judgment under the policies issued by Brit, Liberty, and Evanston. Therefore, it logically follows that any attempt by Brakebush to bring claims for bad faith or UDTP against those Defendants is likewise barred. Accordingly, Brit, Liberty, and Evanston are DISMISSED as parties to this action.[9]

69. The Court reaches a different conclusion, however, with regard to Brakebush's bad faith and UDTP claims against Maxum, Ironshore, Novae, Hallmark, and Hudson.

70. Initially, the Excess Insurers rely in their briefs on case law establishing that tort claims in North Carolina are not assignable as a matter of

---

[9] Accordingly, the Court's use of the term Excess Insurers or Excess Policies for the remainder of this opinion refers only to Maxum, Ironshore, Novae, Hallmark, and Hudson and their policies.

public policy. *See, e.g., Atl. Coast Mech., Inc. v. Arcadis, Geraghty & Miller of N.C. Inc.*, 175 N.C. App. 339, 343 (2006) (citation omitted) ("It is well-established in this state that personal tort claims are not assignable because such assignments would be void against public policy because they promote champerty."); *see also Charlotte-Mecklenburg Hosp. Auth. v. First of Ga. Ins. Co.*, 340 N.C. 88, 91 (1995) (citation omitted) ("There is a distinction between the assignment of a claim for personal injury and the assignment of the proceeds of such a claim. The assignment of a claim gives the assignee control of the claim and promotes champerty.").

71.     These cases, however, are inapposite. Here, the bad faith and UDTP claims at issue are not claims that previously belonged to Raeford and were then assigned to Brakebush. Rather, they are claims that never belonged to Raeford. Instead, Brakebush seeks to bring these claims based on the insurers' conduct *toward Brakebush* in the course of its attempt to collect post-loss proceeds under the policies as an assignee. Indeed, the conduct forming the basis for Brakebush's bad faith and UDTP claims occurred after the assignment from Raeford to Brakebush.

72.     The Excess Insurers next seek to rely upon a line of cases holding that a bad faith claim cannot lie against an insurer when brought by an adverse third-party claimant. In making this argument, however, the Excess Insurers fail to account for the differences between first-party and third-party insurance coverage.

> In the first-party situation, the insurance covers a claim directly made by the insured and examples of first-party coverage are life, health, disability, property, and fidelity insurance. In the third-party situation, a liability claim is brought by a third party which triggers the insurer's duty to defend and indemnify. Examples of third-party coverage

are professional malpractice insurance and commercial liability insurance.

8 NEW APPLEMAN ON INSURANCE LAW LIBRARY EDITION § 90.1 (2021).

73. The cases relied upon by the Excess Insurers all arose in the context of a claim against an insurer brought by an adverse third-party claimant. In those cases, our Court of Appeals held that a bad faith claim is unavailable to an adverse third-party claimant suing under an insurance policy of another. *See*, *e.g.*, *Craven v. Demidovich*, 172 N.C. App. 340, 341–43 (2005). Similarly, the Court of Appeals has stated that "North Carolina law does not recognize a cause of action for third-party claimants against the insurance company of an adverse party based on unfair and deceptive trade practices under N.C.G.S. § 75-1.1." *Id.* at 341–42 (quoting *Wilson v. Wilson*, 121 N.C. App. 662, 665 (1996)).

74. In *Craven*, the plaintiff was injured as the passenger in a vehicle driven by the defendant. *Craven*, 172 N.C. App. at 340–41. The plaintiff made a demand upon the defendant's liability insurer and ultimately sued on theories of bad faith and UDTP based on the insurer's "refusal to timely adjust his claim[.]" *Id.* at 341. The Court of Appeals held that the plaintiff lacked the ability to assert such claims based on the rule that third-party adverse claimants cannot sue under the insurance policy of another. *Id.* at 341–43.

75. In *Wilson*, the plaintiff was injured by her husband's alleged negligence while driving an automobile. *Wilson*, 121 N.C. App. at 663. She brought a negligence claim against her husband and a UDTP claim against his liability insurance carrier after the plaintiff "rejected [a settlement offer from the insurer] as inadequate." *Id.*

The Court of Appeals ruled that the plaintiff could not pursue the UDTP claim as such a claim "may not be asserted by a third-party claimant against the insurer of an adverse party." *Id.* at 665.

76. Critically, neither of these cases involved *first-party* claims. Here, as an assignee of the named insured who possessed a contractual right to collect proceeds under the policy, Brakebush is in a materially different position than the plaintiffs in the cases relied upon by the Excess Insurers.

77. The above-referenced cases cited by the Excess Insurers stand for the proposition that a *third-party claimant* cannot pursue a bad faith or UDTP claim against the insurer of an adverse party. The Excess Insurers are essentially arguing that the Court should construe the term "third party claimant" to include anyone who did not actually contract with the insurer. Under such a construction, Brakebush would not be able to assert a claim for bad faith or UDTP because Raeford—not Brakebush—was the named insured under the policies issued by the Excess Insurers and Brakebush was a "stranger" to the policies.

78. However, the Court rejects this argument because Brakebush cannot properly be viewed as a third-party claimant. *See Bartlett v. Allstate Ins. Co.*, 929 P. 2d 227, 231 (Mont. 1996) (citation omitted) ("[I]n the context of bad faith tort actions, a third-party claimant is typically a person who has a claim against the insured party for certain injuries."); *Lee v. Sapp*, 234 So. 3d 122, 130 (La. App. 2017) (quotation omitted) ("In the world of insurance, a first-party claim is a claim filed by an insured against his own insurer for damage to property or person; whereas a third-party claim

is made by a claimant against the insured for damages allegedly caused by the insured.").

79. By virtue of the assignment from Raeford, Brakebush stepped into Raeford's shoes with respect to the right to collect post-loss proceeds under the Excess Policies. *See Wilmington Sav. Fund Soc'y, FSB v. Mortgage Elec. Registration Sys.*, 265 N.C. App. 593, 599 (2019) (recognizing that an assignee "step[s] into the shoes of [its assignor]"). The Excess Insurers have not cited any case from North Carolina's appellate courts holding that a bad faith or UDTP claim was barred under the circumstances presented here.[10]

80. Additionally, it is important to note that the public policy concerns underpinning the holdings in *Wilson* and *Craven* do not apply to the facts of the present case. In *Wilson*, the Court of Appeals cautioned that "allowing such third-party suits against insurers would encourage unwarranted settlement demands," could lead to "undesirable social and economic effects (i.e., multiple litigation, unwarranted bad faith claims, coercive settlements, excessive jury awards, and escalating insurance, legal and other transaction costs)[,]" and might "result in a conflict of interest for the insurance company." *Wilson*, 121 N.C. App. at 666–67 (citation omitted).

---

[10] Moreover, to the extent that privity between Brakebush and the Excess Insurers is required in order for Brakebush to possess standing to assert a bad faith or UDTP claim, such privity arguably exists as a result of the assignment from Raeford to Brakebush. *See Jones Motor Co. v. Holtkamp, Liese, Beckemeier & Childress, P.C.*, 197 F.3d 1190, 1192 (7th Cir. 1999) ("[A]n assignee is in privity with the other party to its assignor's contract").

81. None of those policy concerns apply when the assignee of the named insured asserts a bad faith claim based on its own interactions with the insurer. As Raeford's assignee, Brakebush is the only party who possesses a valid legal interest in collecting post-loss proceeds from the fire. As a result, the Excess Insurers are not faced with the prospect of receiving demands from both the named insured under the policy and an adverse claimant. The potential for harms in the form of multiple litigation and conflicts of interest are completely absent here.

82. Moreover, a contrary ruling would mean that even though a party in Brakebush's position possessed a legal right as an assignee to seek proceeds under an insurance policy, it would lack any remedy in tort for bad faith conduct by the insurer. Such a result would run counter to the goal of preventing unlawful conduct by insurers with regard to the adjusting and payment of insurance claims.

83. For these reasons, the Excess Insurers' motion to dismiss the bad faith and Chapter 75 claims under Rule 12(b)(1) is DENIED as to Maxum, Ironshore, Novae, Hallmark, and Hudson.

**B. Defendants' Rule 12(b)(6) Motion**

84. Having ruled upon the standing issues underlying the Excess Insurers' Rule 12(b)(1) motion, the Court must now turn its attention to their motion to dismiss for failure to state a valid claim for relief under Rule 12(b)(6).

**1. Declaratory Judgment and Breach of Contract**

85. The Excess Insurers' sole contention regarding the declaratory judgment and breach of contract claims set out in the Complaint is that Brakebush

has no legally enforceable interest in the insurance policies at issue. It appears that this argument is largely—if not completely—derivative of their standing argument. Therefore, because the Court has held that Brakebush does, in fact, possess standing to assert claims under the Maxum, Ironshore, Novae, Hallmark, and Hudson policies, the Excess Insurers' motion to dismiss the breach of contract and declaratory judgment claims as to these Defendants pursuant to Rule 12(b)(6) is DENIED.

### 2. Bad Faith

86. The Excess Insurers also seek dismissal of Brakebush's bad faith claim, arguing that the Complaint fails to allege the essential elements of such a claim. Brakebush, conversely, contends that the allegations concerning the Excess Insurers' "low-ball settlement offer," initial refusal to provide their internal documents regarding Brakebush's claim, and refusal to pay the entirety of the amount shown as recoverable losses in those documents are sufficient to state a valid bad faith claim.

87. "In order to recover . . . for the tort of an insurance company's bad faith refusal to settle, the plaintiff must prove (1) a refusal to pay after recognition of a valid claim, (2) bad faith, and (3) aggravating or outrageous conduct." *Lovell v. Nationwide Mut Ins. Co.*, 108 N.C. App. 416, 420 (1993) (citation omitted).

88. Among other allegations, the Complaint asserts that the Excess Insurers' own documents showed that the extent of the damage incurred from the fire was approximately $1.5 million higher than the amount they paid to Brakebush and that the Excess Insurers subsequently refused to provide an explanation for their refusal to pay the higher amount. Construing the allegations in the light most

favorable to Brakebush, as the Court is required to do at the Rule 12(b)(6) stage, the Court concludes that Brakebush's allegations are sufficient to state a claim for bad faith.

89.     In their briefs, the Excess Insurers invite the Court to delve into the contents of their internal documents and determine whether their refusal to issue payment in a higher amount was reasonable.  The Court must decline this invitation as this argument goes well beyond the limited scope of a Rule 12(b)(6) inquiry.

90.     The Excess Insurers also argue that Brakebush has improperly attempted to bring a bad faith claim under N.C.G.S. § 58-63-15 because that statue does not provide for a private cause of action.  Such an argument misconstrues Brakebush's bad faith claim.  Although this section of the Complaint contains a reference to N.C.G.S. § 58-63-15(11), the Court interprets the bad faith claim asserted by Brakebush as being based under North Carolina common law.

91.     Therefore, the Excess Insurers' motion to dismiss the bad faith claim pursuant to Rule 12(b)(6) is DENIED.

### 3.     Unfair and Deceptive Trade Practices

92.      The Excess Insurers also contend that Brakebush has not stated a valid claim for UDTP.

93.     "To state a claim under G.S. § 75-1.1, Plaintiff must allege facts sufficient to show (1) an unfair or deceptive act or practice or an unfair method of competition; (2) in or affecting commerce; (3) that proximately causes actual injury to

the Plaintiff." *JTG Equip. & Supply, LLC v. EBay, Inc.*, 2015 NCBC LEXIS 9, at *19 (N.C. Super. Ct. Jan. 23, 2015).

94. Based on the Court's careful reading of the Complaint, it concludes that— for purposes of Rule 12(b)(6)— the allegations contained therein with regard to this claim are sufficient to state a valid claim for relief. *See Kielbania v. Indian Harbor Ins. Co.*, 2012 U.S. Dist. LEXIS 127849, at *34 (M.D.N.C. Sept. 10, 2012) ("[A] violation of Section 58-63-15(11) constitutes an unfair and deceptive trade practice in violation of N.C. Gen. Stat. § 75-1.1 as a matter of law.").

95. Therefore, the Excess Insurers' motion to dismiss Brakebush's UDTP claim pursuant to Rule 12(b)(6) is DENIED.

### 4. Consequential Damages

96. The Excess Insurers also contend that Brakebush's claim for consequential damages should be dismissed because Brakebush "fail[ed] to plead that defendants contemplated that they would have any liability to anyone other than Raeford." (ECF No. 43, at p. 20.)

97. The Court concludes that it is too early in this litigation to decide whether Brakebush would be entitled to recover consequential damages if it ultimately prevails in this action. Therefore, the Excess Insurers' motion to dismiss the claim for consequential damages is DENIED.

## C. Defendants' Motion to Strike

98. The Excess Insurers have also moved to strike Brakebush's claim for a declaratory judgment pursuant to Rule 12(f) on the basis that declaratory relief will be unnecessary in light of the Court's resolution of the breach of contract claims. For this reason, they contend, the declaratory judgment claim is merely redundant. Brakebush disagrees, arguing that a declaratory judgment will assist in clarifying the obligations of the various Excess Insurers.

99. The Court concludes that a declaratory judgment claim is an appropriate mechanism for resolution of key disputes between the parties in this case. Brakebush is seeking an adjudication regarding the various obligations under eight different insurance policies. The issues upon which Brakebush seeks such declaratory relief are distinct—at least in part—from the issue of whether a breach of contract occurred.

100. Therefore, the Excess Insurers' Motion to Strike is DENIED.

## D. Brakebush's Motion to Strike

101. Finally, Brakebush moves to strike certain portions of the Excess Insurers' reply brief based on its contention that they are in violation of Rule 7.7 of the North Carolina Business Court Rules. Brakebush contends that the reply brief goes beyond merely addressing arguments raised in its response brief and instead improperly raises new issues. In the alternative, Brakebush requests leave to submit a surreply brief.

102. The Court is satisfied that the parties have been given a full and fair opportunity to brief all issues in this case, including the submission of supplemental briefs subsequent to the filing of the Excess Insurers' reply brief. The parties were also afforded the opportunity to request an additional hearing in this matter, which they declined.

103. Accordingly, Brakebush's Motion to Strike is DENIED.

## CONCLUSION

**THEREFORE,** it is hereby **ORDERED** that the parties' pending motions are **GRANTED** in part and **DENIED** in part, as follows:

1. Defendants' Motion to Dismiss pursuant to Rule 12(b)(1) against Defendants Brit, Evanston, and Liberty is **GRANTED**, and all claims against those Defendants are hereby **DISMISSED** without prejudice.

2. Defendants' Motion to Dismiss pursuant to Rule 12(b)(1) as to all claims against Defendants Maxum, Ironshore, Novae, Hallmark, and Hudson is **DENIED**.

3. Defendants' Motion to Dismiss pursuant to Rule 12(b)(6) is **DENIED** as to all claims against Defendants Maxum, Ironshore, Novae, Hallmark, and Hudson.

4. Defendants' Motion to Strike is **DENIED**.

5. Brakebush's Motion to Strike is **DENIED**.

SO ORDERED, this the 1st day of November, 2021.

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge for
Complex Business Cases